**FEDERAL DEPOSIT INSURANCE CORPORATION, in its Corporate Capacity, Plaintiff–Appellee,**

v.

**Clifford HAMILTON and Dee Iva Hamilton, Defendants/Third–Party Plaintiffs–Appellants,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Texas Bank & Trust Company, and Larry Tester, Third–Party Defendants–Appellees.**

No. 90–1395.

United States Court of Appeals, Fifth Circuit.

Aug. 28, 1991.

Gregory T. House, Steve Alexander, Arens & Alexander, Fayetteville, Ariz., for Clifford and Dee Iva Hamilton.

Guy Wade, III, Jenkins & Gilchrist, Dallas, Tex., for Federal Deposit Ins. Corp., in all Capacities.

H. Grady Terrill, III, Kent Hale, Carr, Fouts, Hunt, Craig, Terrill & Wolfe, Lubbock, Tex., for Larry Tester.

Jeannette E. Roach, Sr. Atty., Washington, D.C., for Federal Deposit Ins. Corp., Corporate Capacity.

Before REYNALDO G. GARZA, POLITZ, and JONES, Circuit Judges.

POLITZ, Circuit Judge:

Clifford Hamilton and Dee Iva Hamilton appeal the summary judgment dismissal of their claims against the Federal Deposit Insurance Corporation in both its corporate capacity and as receiver for Texas Bank and Trust Company (TB & T). For the reasons assigned, we affirm.

### Background

The Hamiltons have been successful farmers in Lubbock County, Texas since 1945. They routinely financed their farming operations through a line of credit at local banks. Early in each farming season the Hamiltons anticipated their expenses for the year and executed a note for the full amount of the line of credit, drawing against the total as funds were needed. Typically the Hamiltons informed the bank of a needed draw and the bank promptly credited their account with the requested funds. On March 25, 1986, the Hamiltons gave TB & T a note for the 1986 season in the amount of $226,186.95. The note stated that it was for "Renewal 1985 Farm Line & 1986 Farm Line."

TB & T's records reflect that the note represented a renewal of a carryover balance from the 1985 farm line plus $160,000 for the 1986 season. No further terms were contained in the note itself. Bank records made clear that the entirety of the note had not been borrowed. The note therefore reflected a total line of credit only partially consumed. Pursuant to the banking customs in Lubbock County which, unfortunately, were not memorialized in writing in any bank record, the Hamiltons and TB & T officials understood that the bank was obligated to fund the full amount in the increments requested by the Hamiltons and were to honor these requests within one business day.[1]

---

1. TB & T's obligation to fund the requests was not absolute. According to the understanding of the parties, TB & T would not have to advance funds on the line of credit if the bank deemed the Hamiltons an unworthy credit risk.

There is no evidence to indicate that TB & T had made any such determination during 1986. According to TB & T's July 8, 1986 Credit Review Evaluation, "Clifford Hamilton is probably the best farmer in Lubbock County and one of the

In June 1986 TB & T began to experience financial trouble. Two calls by the Hamiltons were not timely honored—their June 5 request for $10,000 was not credited until June 13 and their August 5 request for $18,000 was not honored until August 14. These delays were contrary to both prior practices and the Hamiltons' understanding and allegedly caused substantial losses to the farming operations.

On September 19, 1986 TB & T was declared insolvent and the FDIC was appointed receiver pursuant to 12 U.S.C. § 1821(e). The FDIC in its corporate capacity purchased the note from the FDIC in its receiver capacity. The remaining TB & T assets held by FDIC as receiver were transferred to RepublicBank Lubbock pursuant to 12 U.S.C. § 1823(c)(2)(A). After a subsequent merger RepublicBank became known as First RepublicBank Lubbock (FRB).

FDIC–Corporate sued the Hamiltons in the district court for the northern district of Texas to recover the amount which had been advanced on the note. The Hamiltons counterclaimed against FDIC–Corporate and filed a third-party complaint against FRB.[2] The Hamiltons alleged that they were entitled to a setoff for damages caused by TB & T's breach of its obligation to advance funds timely pursuant to the line of credit.

Thereafter the Hamiltons filed a Chapter 12 bankruptcy which stayed the FDIC–Corporate's suit to collect on the note. In the bankruptcy proceedings the Hamiltons filed an adversary proceeding against the FDIC in its capacity as receiver for both TB & T and FRB. This action contained allegations identical to those in the counterclaim and third-party complaint. After the bankruptcy court confirmed the Hamiltons' plan of reorganization the adversary proceedings were consolidated with the original suit brought by FDIC–Corporate and the litigation resumed. The Hamiltons admit their liability on the note, which is in

abeyance as a result of the bankruptcy proceeding. Accordingly, their claim for offset is the only presently viable dispute between the parties.

Advancing under the shield of *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and 12 U.S.C. § 1823(e), the FDIC moved for summary judgment against the Hamiltons' setoff claim. The trial court granted this summary judgment motion with respect to FDIC–Corporate and FDIC as receiver for TB & T. The court concluded that the note did not impose any line of credit obligations on TB & T. In particular, the court found that by relying on TB & T's records—the note itself and TB & T's Board minutes— "the only thing the FDIC could see was that the Hamiltons had signed a $226,000+ note."

> The 1986 note does *not* state that the Hamiltons were entitled to draw on the note in partial payments; nor is there any indication that the Hamiltons had not received the full proceeds in one lump sum. The note does not facially place any requirements on the Bank to fund on the note at any specific time or within any specific time constraints.

> There are minutes of the Board approving the 1986 farm line note, but there is no mention in the minutes that the Hamiltons would make partial draws on the note or that the Bank was required to make deposits on the same day as any specific draw was requested, or for that matter any time limit for honoring requests for advances.

The trial court found that the prevailing banking custom in Lubbock County was "merely an oral understanding or agreement ... and therefore was not a part of the records of the Bank upon which the FDIC would have notice."

Upon FDIC's motion, the trial court amended its order *nunc pro tunc* to dismiss Hamilton's claims against the FDIC as receiver for FRB based on the reasoning

---

strongest farmers.... We are very well secured. He is most knowledgeable and I feel comfortable that he will be able to perform as well as any farmer for the year 1986."

**2.** The FDIC was subsequently appointed receiver for FRB and was substituted for FRB in this litigation.

in the summary judgment order. The Hamiltons timely appealed.

### Analysis

■ In reviewing a summary judgment we apply the same substantive test as the district court. Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; S. Childress, *Standards of Review* 311–13 (1986).

### The D'Oench, Duhme Estoppel Doctrine

■ The Hamiltons argue that the trial court erred in holding that the *D'Oench, Duhme* estoppel doctrine applies to their specific setoff claim against the FDIC. In that case the Supreme Court concluded that the legislation creating the FDIC expressed a "federal policy to protect [the FDIC] ... against misrepresentations as to the ... assets in the portfolios of the banks which [the FDIC] insures...." 315 U.S. at 457, 62 S.Ct. at 679, 86 L.Ed. at 962. The estoppel doctrine bars defenses or claims against the FDIC that are based on unrecorded or secret agreements that alter the terms of facially unqualified obligations. 315 U.S. at 460, 62 S.Ct. at 680, 86 L.Ed. at 965. As the *D'Oench, Duhme* doctrine has expansively evolved, the bar now applies where the borrower is party to a scheme or agreement which would tend to either deceive or mislead the creditors of the bank or the bank examiners. *Bowen v. FDIC,* 915 F.2d 1013 (5th Cir.1990); *Bell & Murphy & Assoc., Inc. v. Interfirst Bank Gateway, N.A.,* 894 F.2d 750 (5th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990). It is not relevant that the borrower did not intend to deceive banking authorities or that the underlying transaction was not fraudulent. *Bowen,* 915 F.2d at 1017; *Beighley v. FDIC,* 868 F.2d 776 (5th Cir.1989). Trapped in this "dungeon of *Duhme* "[3] are claims based on agreements not reflected in a bank's records. *Union Federal Bank of Indianapolis v. Minyard,* 919 F.2d 335 (5th Cir. 1990); *Bowen,* 915 F.2d at 1016; *Kilpatrick v. Riddle,* 907 F.2d 1523 (5th Cir. 1990), *cert. denied,* — U.S. ——, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991); *Bell & Murphy,* 894 F.2d at 755; *Beighley,* 868 F.2d at 784.

■ *D'Oench, Duhme* bars the Hamiltons' claim unless the FDIC should have known from TB & T's records that TB & T was committed to fund them on a line of credit and to do so in a timely manner. The Hamiltons point to several TB & T records which allegedly reflect the parties' understanding of their line of credit. The note states that "the purpose of this loan is renewal 1985 farm line & 1986 farm line."[4] TB & T's board minutes merely indicate that a line of credit was approved. A July 3, 1986 TB & T memo to the Hamiltons' credit file declared that TB & T was "today advancing an additional $5,000.00 on each of the lines per request...." A July 8, 1986 TB & T "Credit Review Evaluation" of the Hamilton loan indicates that as of that date, there was a balance of $155,253.07 on the $226,286.96 note. The "Composite Opinions and Comments" section of the "Credit Review Evaluation" provides as follows:

Loan # 2325 farm operating line of credit with a commitment of $226,186.95.... The current balance of $155,253.09 includes a carryover from the 1985 line of $66,186.95 and a payment from ASCS of $10,923.88 for a gross advance to date of $166,176.97. According to his Budget for 1986, he will need an additional $71,757 to finish the year putting his expense figure at $237,933 or $11,747 over budget. He has projected income at $233,000 which leaves him $4,933 short of payout.

In an August 13, 1986 TB & T letter to Hamilton the note was described as "Farm Line Note # 2325 in the original amount of $226,286.95 with $175,263.07 advanced as if

---

3. An apt characterization by Judge Goldberg in *Bowen,* 915 F.2d at 1016.

4. The "New Loan Application" for the note stated that the purpose of the loan was "Renewal of 1985 Farm Line" and "1986 Farm Line."

[sic] this date." The letter further cautioned Hamilton that "[d]ue to our lack of liquidity in our bank, we request that you move this debt from our bank, if at all possible." An August 15, 1986 TB & T memo to the Hamiltons' credit file provides as follows:

> Due to the fact that the crops are in the field and they are looking very favorable per our last two inspections by Mickey Powell, it is felt that it is to the best interests of the bank that we continue to advance on this line in an effort to maximize the yield of the crops and in turn, repay the 1986 farm line. In my opinion, the collateral would be in great jeopardy if we did not continue to complete the growing season of the various crops. In my opinion, failure to continue the commitment will impair the value of the collateral and the bank's ability to collect the loan advanced.

Viewing TB & T's records in the light most favorable to the Hamiltons, we must conclude that the FDIC should have known that the note reflected, at least in part, a line of credit agreement in which TB & T would make continued advances to the Hamiltons as needed during the farming season. TB & T's records do not, however, reflect that TB & T was to fund the line of credit within one business day of a request. The only TB & T record which would even suggest that TB & T was so obligated is the July 3 memo to the Hamiltons' credit file which stated that on one occasion TB & T advanced funds on the same day as requested. This single instance is insufficient to put the FDIC on notice of TB & T's obligations as understood by both TB & T and the Hamiltons. Therefore, we find that TB & T's records do not sufficiently evidence the obligation upon which the Hamiltons base their claim.

Nevertheless, the Hamiltons argue that the *D'Oench, Duhme* doctrine should not bar their claim simply because it does not arise from an explicitly recorded obligation in the bank's records. They contend that the true test for the application of the *D'Oench, Duhme* doctrine is whether the agreement may mislead bank examiners. They maintain that the rule that claims based on an unrecorded agreement are barred is not an absolute rule *per se* but just a reflection of *D'Oench, Duhme* as applied to claims based on oral agreements or collateral writings not properly recorded. *See, e.g., Bowen,* 915 F.2d at 1016 (in rejecting claim based on an oral agreement, the court stated *"D'Oench* bars the use of unrecorded agreements ... as the basis for defenses or claims against the FDIC."); *Bell & Murphy,* 894 F.2d at 753–54 (applying *D'Oench, Duhme* to unrecorded collateral writing); *Beighley,* 868 F.2d at 784 (applying *D'Oench, Duhme* to oral side agreement). The Hamiltons further maintain that their claim, on the other hand, is based on the implied understanding of a properly recorded agreement, *i.e.,* how the express terms of the agreement are understood in light of the banking customs and practices in Lubbock County. Therefore, argue the Hamiltons, the dispositive question should not be whether the bank records specifically state the bank's obligation to fund timely the line of credit; rather, it should be whether TB & T's obligation as implied by prevailing banking customs is an agreement which tends to mislead bank examiners.

We acknowledge the logic of the point raised by the Hamiltons and recognize its equitable persuasiveness. Insofar as our research has disclosed this case presents a question of first impression in this circuit. Notwithstanding the considerable force of the argument advanced by the Hamiltons, we must conclude that the long arm of *D'Oench, Duhme* reaches out to block their claims. The rationale which bars claims based on oral agreements and collateral writings is equally applicable to claims based on unwritten, albeit widespread and prevailing, banking customs. Equity argues strongly that it should not be so, but the now broad redoubts of the *D'Oench, Duhme* fortress bind our analysis.

A review of *D'Oench, Duhme's* applications to oral agreements and collateral writings teaches that there are two policy considerations which favor the *D'Oench, Duhme* bar. First, there is the concern that bank examiners safely may rely on the

bank's records to ascertain all of the insolvent bank's obligations. Judge Goldberg, in his inimitable fashion best explained the purpose behind this rationale:

> Fundamentally, *D'Oench* attempts to ensure that FDIC examiners can accurately assess the condition of a bank based on its books. The doctrine means that the government has no duty to compile oral histories of the bank's customers and loan officers. Nor must the FDIC retain linguists and cryptologists to tease out the meaning of facially-unencumbered notes.
>
> Spreadsheet experts need not be joined by historians, soothsayers, and spiritualists in a Lewis Carroll-like search for a bank's unrecorded liabilities.

*Bowen*, 915 F.2d at 1016; *Cf. Langley v. FDIC*, 484 U.S. 86, 91–92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340, 347 (1987) ("[F]ederal and state bank examiners ... rely on a bank's records in evaluating the worth of the bank's assets.... Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions."). This justification for the *D'Oench, Duhme* bar is equally applicable in the context of obligations implied by prevailing bank practices. Such implied obligations would not be readily apparent to FDIC examiners and the FDIC would face similar burdens as those described above in ascertaining the bank's concealed liabilities.[5]

A second justification for applying *D'Oench, Duhme* to oral agreements or collateral writings is that the obligor as party to the transaction is in a better position to protect himself than the FDIC. The obligor could have insisted that the collateral terms be put in writing and properly recorded by the bank. *Bell & Murphy*, 894 F.2d at 754; *FDIC v. Texarkana Nat. Bank*, 874 F.2d 264 (5th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990). Therefore, the obligor and not the FDIC or the bank's innocent depositors or creditors should suffer the loss caused by the record omissions. *See Bell & Murphy*, 894 F.2d at 754; *FSLIC v. Murray*, 853 F.2d 1251 (5th Cir.1988); *FDIC v. McClanahan*, 795 F.2d 512 (5th Cir.1986).

### The Bar of 12 U.S.C. § 1823(e)

The Hamiltons argue that the trial court erred in finding that their claim against the FDIC in its capacity as receiver for TB & T is barred by 12 U.S.C. § 1823(e).[6] Section 1823(e), the statutory companion of the *D'Oench, Duhme* doctrine, affords the FDIC comprehensive protection against any agreement which tends to diminish or defeat the FDIC's interest in any asset acquired by it unless such agreement: (1) is in writing, (2) was executed by the depository institution and the obligor contemporaneously with the acquisition of the asset, (3) was approved by the board of directors of the depository institution, and (4) has been continuously an official record of the depository institution.[7] Section 1823

---

5. The Hamiltons argue that this rationale does not have the same force when dealing with obligations implied by prevailing banking custom. In the case of oral agreements or collateral writings, the FDIC must examine each individual transaction to determine the scope of the bank's liability. For obligations implied by prevailing banking customs, the FDIC need only make one investigation for each type of instrument to determine the bank's obligations for an entire class of like instruments. While the investigative burden on the FDIC is arguably less in the latter context, the case law interpreting the *D'Oench, Duhme* doctrine evidences a policy to prevent any such type of investigations and to avoid hair-splitting fact-based inquiries of the type that will ensue when assessing the obligations implied from prevailing banking practices. *See Bowen*, 915 F.2d at 1016–17.

6. The protection of 12 U.S.C. § 1823(e) applies to the FDIC in both its corporate and receiver capacities. 12 U.S.C. §§ 1821(d)(9)(A), 1823(e); *see also Bowen*, 915 F.2d at 1015 n. 3.

7. 12 U.S.C. § 1823(e) provides:

   No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement

effectively bars claims against the FDIC based on unrecorded agreements.

Nonetheless, the Hamiltons argue that their unrecorded agreement evades this bar because the note satisfies section 1823(e)'s requirements, and because the line of credit is part of the "writing" as manifested by this note.[8] There is no question that the note itself satisfies the requirements of section 1823(e). However, we believe that section 1823(e)'s use of the term "in writing" cannot include the writing's implied terms.

We find no controlling precedent but find that the term "in writing," for section 1823 purposes, has been narrowly construed so as to incorporate only those obligations expressed on the face of the subject writing. In *Beighley* we concluded that a writing satisfying section 1823 did not include an obligation from a contemporaneous oral agreement that was obliquely reflected in the bank's records. Likewise, our colleagues in the Seventh Circuit held that a writing which satisfied section 1823(e) and expressly referenced a collateral unrecorded writing did not include the obligations undertaken in the collateral instrument. *FDIC v. O'Neil*, 809 F.2d 350 (7th Cir. 1987).

### *The Bilateral Obligations Exception to D'Oench, Duhme*

■ Finally, the Hamiltons seek to apply the bilateral obligation exception to the *D'Oench, Duhme* doctrine. *See Howell v. Continental Credit Corp.*, 655 F.2d 743 (7th Cir.1981). *Howell* found an exception to the *D'Oench, Duhme* doctrine "where the document the FDIC seeks to enforce is one ... which facially manifests *bilateral* obligations and serves as the basis of the [obligor's] defense." 655 F.2d at 746 (em-

phasis in original). We have cited with approval the *Howell* exception to the *D'Oench, Duhme* doctrine. *Bell & Murphy*, 894 F.2d at 754; *McClanahan*, 795 F.2d at 515. The Hamiltons, however, cannot avail themselves of this exception because the note upon which the Hamiltons base their claim does not facially manifest TB & T's bilateral obligation to fund timely the line of credit. *Cf. Bell & Murphy*, 894 F.2d at 754 (*Howell* exception to *D'Oench, Duhme* applicable only if bank's obligation appears on face of document which FDIC seeks to enforce and document is properly recorded in the bank's records); *O'Neil*, 809 F.2d at 354 (*Howell* exception not applicable where bank's obligation does not explicitly appear on the face of the document sought to be enforced by the FDIC).

We AFFIRM the summary judgment dismissing the claims of the Hamiltons.

---

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from time of its execution, an official record of the depository institution.

8. It is clear that the note's implied terms are part of the "agreement" within the meaning of section 1823(e), as this term is to reflect expansively the parties' bargain. *See Langley*, 484 U.S. at 90–93, 108 S.Ct. at 400–02, 98 L.Ed.2d at 346–48; *Shuler v. Resolution Trust Corp.*, 757 F.Supp. 761 (S.D.Miss.1991).