**SWEET JAN JOINT VENTURE, et al., Plaintiffs,**

**v.**

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Sunbelt Savings Association of Texas; Federal Deposit Insurance Corporation, as Manager of the FSLIC Resolution Fund, Successor to FSLIC in its Corporate Capacity; and Sunbelt Savings, FSB, Defendants.**

**Civ. A. No. CA3–89–1757–D.**

United States District Court, N.D. Texas, Dallas Division.

June 24, 1992.

---

Alan S. Loewinsohn and Gary D. Eisenstat of Figari & Davenport, L.L.P., Dallas, TX, for plaintiffs.

Charles I. Appler and Curtis L. Marsh of Hopkins & Sutter, Dallas, TX, for defendant F.D.I.C.

## MEMORANDUM OPINION AND ORDER

FITZWATER, District Judge.

The instant motion for partial summary judgment presents questions concerning whether a transfer of notes was fraudulent and whether the *D'Oench, Duhme* estoppel rule precludes an offset claim. For the reasons that follow, the court grants in part and denies in part the motion.

### I

Plaintiffs are one joint venture, ten individuals, two corporations, and one general partnership. They filed suit in 1989 against the Federal Savings and Loan Insurance Corporation ("FSLIC") in its capacity as Receiver for Sunbelt Savings Association of Texas ("Old Sunbelt") and its corporate capacity, and against Sunbelt Savings, FSB ("New Sunbelt"). In their second amended complaint filed October 31, 1991, they sue the defendants in six counts, pleading theories of fraudulent transfer (including a request for declaratory judgment), declaratory judgment, breach of contract, breach of duty of good faith and fair dealing, violations of the Texas Proper-

ty Code, and a right to recover attorney's fees under Texas law. The defendants are now the Federal Deposit Insurance Corporation, as Receiver for Sunbelt Savings Association of Texas ("FDIC–Receiver"), the Federal Deposit Insurance Corporation, as Manager of the FSLIC Resolution Fund, Successor to FSLIC in its Corporate Capacity ("FDIC–Corporate"), and New Sunbelt.

Plaintiffs' lawsuit is based upon actions related to a 1973 note executed by the Park Forest Plaza Trust Agreement ("Trust Agreement") and payable to National Bank of Commerce of Dallas ("BancTexas"),[1] and a note executed in 1983 by Sweet Jan Joint Venture and payable to Savings Association of the West ("Savings Association"), later merged into Old Sunbelt.

Plaintiffs allege that in April 1973 the Trust Agreement executed a promissory note (the "BancTexas Note") in the original principal amount of $2.7 million in favor of BancTexas. As of August 16, 1984, principal in the amount of $1.9 million together with accrued interest remained unpaid on the BancTexas note. On that date, Park Forest, Ltd. ("Park Forest") purchased the real property that secured the note (together with an office building located on the property) by paying $1 million in cash and executing a wraparound promissory note (the Park Forest "Wrap Note") in the original principal amount of $7.2 million payable to Texoma Savings Association of Grayson County, Texas ("Texoma"). The unpaid principal and interest owed on the April 1973 BancTexas Note were incorporated in the Park Forest Wrap Note. Texoma subsequently merged into Old Sunbelt.

Plaintiffs aver that Old Sunbelt was required to make all payments due on the BancTexas Note pursuant to the express terms of the Park Forest Wrap Note. They contend Park Forest was not obligated to make payments under the Park Forest Wrap Note unless and until there was net operating income generated by the property that secured the note. Old Sunbelt subsequently ceased making the payments to BancTexas, resulting in acceleration of the note. Old Sunbelt was thereafter declared insolvent and the FSLIC appointed as its Receiver. The FSLIC, as Receiver, then transferred the Park Forest Wrap Note to New Sunbelt pursuant to a purchase and assumption transaction. When New Sunbelt refused to make payments on the BancTexas note, BancTexas foreclosed upon the property and purchased it at foreclosure. Park Forest later assigned to the plaintiffs its claims arising out of these transactions.

On May 4, 1983, plaintiff Sweet Jan Joint Venture ("Sweet Jan") executed a promissory note (the "Sweet Jan Note") in the original principal amount of $4.8 million in favor of Savings Association, later merged into Old Sunbelt. The note was secured by certain real property; additionally, the individual plaintiffs guarantied payment of the Sweet Jan Note.[2] On June 1, 1988 the parties entered into a modification note ("Modification Note"). According to plaintiffs, the Sweet Jan Note and Modification Note were transferred to the FSLIC–Receiver and then to New Sunbelt and then on December 30, 1988 transferred from New Sunbelt to FSLIC–Corporate.

In count one of their second amended complaint, plaintiffs allege the December 30, 1988 transfer of the Sweet Jan Note

---

1. For ease, the court refers to National Bank of Commerce of Dallas as BancTexas, its successor.

2. In the court's April 15, 1992 memorandum opinion and order, it *declined* to hold plaintiff Jan Barboglio Feldman MacDonald ("MacDonald") conditionally liable as a guarantor of the Sweet Jan Note because "the court has not located evidence of the guaranty." Mem.Op. & Order at 8. In plaintiffs' second amended complaint filed October 31, 1991, however, plaintiffs (of whom MacDonald is one) allege they "have *each* executed written guaranties of the Sweet

Jan Note." Ps.2d Am.Compl. at 9, ¶ 25 (emphasis added). Unless withdrawn, this allegation is a binding judicial admission.

While the admission means MacDonald concedes she is a guarantor, without evidence of the text of the guaranty the court cannot determine the nature and extent of MacDonald's liability. These are contested issues in this case. *See, e.g.,* Apr. 15, 1992 Mem.Op. & Order at 8–10 (addressing alleged cap on liability). The court therefore adheres to the result of its April 15 decision as it pertains to plaintiff MacDonald, while noting this modification in analysis.

from New Sunbelt to FSLIC–Corporate is void as a fraudulent transfer. They seek a decree setting aside the transfer as void and a decree or declaratory judgment that any obligation of plaintiffs to New Sunbelt is extinguished, offset, or reduced by a judgment to be obtained against New Sunbelt on the basis of the other claims of the complaint. They also seek a judgment that they owe nothing on the Sweet Jan Note, Modification Note, or their guaranties.[3] In count two, plaintiffs alternatively assert that a controversy exists between plaintiffs and FSLIC–Corporate concerning the amounts due and owing on the Sweet Jan Note, Modification Note, and guaranties. They plead for a declaratory judgment that any obligation they have to the FSLIC is extinguished or offset based on the other theories of their complaint and that they owe nothing on the Sweet Jan Note, Modification Note, and guaranties.

On September 22, 1989, FDIC–Corporate moved for summary judgment and to dismiss, seeking dismissal of counts one and two. The court denied the motion in a memorandum opinion and order filed May 2, 1990. The question presented was whether there was mutuality of obligation between FSLIC–Receiver or the plaintiffs, so that a right of setoff could have existed. *See* May 2, 1990 Mem.Op. & Order at 2. The court denied the motion because "plaintiffs complain not only of Old Sunbelt's actions, but also of New Sunbelt's." *Id.* at 3. The court also held the relevant date for determining mutuality of obligation was December 30, 1988. *Id.* at 4. Because the issue was not properly framed on the basis of that date, *see id.* & n. 3, the court was unable to determine the propriety of summary judgment.

Accepting the court's invitation in the order to "demonstrate its entitlement to summary judgment on either count one or count two of plaintiffs' complaint in light of today's ruling," *id.* at 4–5, FDIC–Corporate filed another summary judgment motion on April 5, 1991. Although the court reached several issues in an opinion filed

April 15, 1992, the court did not decide this motion because while the motion was pending, the court permitted plaintiffs to amend their complaint. In a separate order filed the same day, the court denied the motion without prejudice to filing a subsequent motion that addressed plaintiffs' second amended complaint. Apr. 15, 1992 Order at 2. FDIC–Corporate now files its May 8, 1992 second motion for summary judgment, reurging a right to judgment on counts one and two of plaintiff's second amended complaint. FDIC–Corporate contends it is entitled to judgment as a matter of law and that a rational jury could not find the December 30, 1988 transfer was fraudulent. It urges that plaintiffs have no right of setoff against FDIC–Corporate, FDIC–Receiver, and/or New Sunbelt by reason of the *D'Oench, Duhme* estoppel rule, 12 U.S.C. § 1823(e), and the federal common law holder in due course doctrine.

## II

The court considers first whether FDIC–Corporate is entitled to summary judgment dismissing plaintiffs' fraudulent conveyance claim.

### A

Texas law provides in relevant part that a transfer made by a debtor is fraudulent as to a creditor if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." Tex.Bus. & Comm.Code Ann. § 24.005(a)(1) (West 1987). A transfer is void with respect to a creditor "if the transfer was intended to delay, hinder, or defraud that creditor from obtaining 'that to which he is or may become entitled.'" *Roland v. United States*, 838 F.2d 1400, 1402 (5th Cir.1988).

Plaintiffs contend New Sunbelt made the December 30, 1988 transfer of the Sweet Jan Note and/or Modification Note with actual intent to hinder, delay, or defraud the plaintiffs. They aver that FSLIC–Cor-

**3.** This request has been resolved partially against plaintiffs in the court's April 15, 1992 memorandum opinion and order, as modified April 24, 1992 (on motion for clarification or reconsideration).

porate obtained title to the Note and Modification Note with full knowledge of New Sunbelt's intent. *See* Ps.2d Am.Compl. at 10, ¶ 27.

FDIC–Corporate seeks summary judgment as to this claim on two grounds. It first contends that plaintiffs' claim fails as a matter of law because both the Sweet Jan Note and the Park Forest Wrap Note were included in the December transfer. It also asserts that plaintiffs have failed to raise a genuine issue of material fact as to New Sunbelt's actual intent to hinder, delay, or defraud the plaintiffs.[4]

**B**

**1**

■ At the outset, the court notes some confusion concerning the nature of plaintiffs' theory. Plaintiffs apparently allege that the December 30 transfer of both notes was intended to deprive them of their rights as creditors. According to Texas law, a creditor is any person "who has a claim." Tex.Bus. & Comm.Code Ann. § 24.002(4) (West 1987). A claim "means a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." § 24.002(3). Plaintiffs' status as a creditor appears to be grounded on an alleged right to payment based upon the failure of New Sunbelt to make note payments to Banc-Texas. It is this right, rather than a general right of offset, that appears to form the basis for plaintiffs' allegations of fraudulent conveyance. Thus the court must determine whether FDIC–Corporate is entitled to judgment as a matter of law on plaintiffs' claim that New Sunbelt intended to hinder, delay, or defraud plaintiffs' claim for payment when New Sunbelt transferred the notes to FSLIC–Corporate.

**2**

FDIC–Corporate first contends plaintiffs' claim fails as a matter of law because both notes were transferred. Absent the transfer of both notes, it is argued, the mutuality of obligation (and thus any opportunity to assert a setoff) was not destroyed. If the right to setoff was not eliminated, then plaintiffs' rights as creditors were not affected.

As the court understands plaintiffs' theory, however, New Sunbelt adversely affected plaintiffs' rights by transferring one or both notes. As long as New Sunbelt held both notes, plaintiffs could reduce their liability on the Sweet Jan Note to the extent that New Sunbelt was liable for failing to make payments owed on the BancTexas Note. By transferring the Sweet Jan Note and/or the Park Forest Wrap Note, plaintiffs could not obtain the same opportunity to reduce their liability. FDIC–Corporate could sue them on the Sweet Jan Note and/or the Park Forest Wrap Note.[5] Plaintiffs could not use New Sunbelt's conduct regarding the BancTexas Note as an offset to liability because of defenses and superpowers available to FDIC–Corporate. Plaintiffs would be left to recover separately from New Sunbelt, a dubious proposition given New Sunbelt's financial standing.

Under plaintiffs' theory, their claim against New Sunbelt was arguably adversely affected by the December 30, 1988 transfer, notwithstanding that both notes were transferred.

**3**

FDIC–Corporate also contends plaintiffs have failed to come forward with evidence sufficient to raise a genuine issue as to the fraudulent intent of the parties to the December transfer. FDIC–Corporate has offered evidence that New Sunbelt and FSLIC–Corporate entered into a purchase and assumption agreement on December 30, 1988 whereby New Sunbelt sold to FSLIC–Corporate numerous commercial

---

**4.** FDIC–Corporate also argues that it is entitled to summary judgment because the law presumes that it entered into the December transaction in good faith. This is not an independent legal basis for judgment in FDIC–Corporate's

favor. Even if such a presumption exists, it has been rebutted by plaintiffs' contrary evidence.

**5.** Not all plaintiffs are alleged to be obligated on the Park Forest Wrap Note.

loans that had an aggregate book value of $1.25 *billion.* In exchange for these assets, FSLIC–Corporate executed a note in the amount in favor of New Sunbelt. The Sweet Jan Note and the Park Forest Wrap Note were included in the transaction.

According to FDIC–Corporate, the sole motivation for undertaking the December 30 transaction was to ensure that New Sunbelt met Internal Revenue Code requirements for tax treatment as a qualifying thrift, resulting in a savings of $850 million in potential tax liability. *See, e.g.,* Vail Dep. 43–44; 52–53; 148–49. To obtain this treatment, at least 60 percent of the tax basis of New Sunbelt's assets at year-end was required to be in qualifying assets. *See id.* at 56. No earlier than December 15, 1988—15 days prior to effecting the transaction—the decision was made to sell a sufficient amount of non-qualifying assets to FSLIC–Corporate so that New Sunbelt could comply with the 60 percent test imposed by the Internal Revenue Code. *Id.* at 150.

Various New Sunbelt officials were involved in selecting the non-qualifying assets to be included in the transaction, including New Sunbelt Vice President of Corporate Tax Leslie Vail ("Vail") and New Sunbelt Vice President Robert Hart ("Hart"). The selection of loans proceeded quickly in order for completion to occur prior to the end of 1988. Hart Dep. (Oct. 25, 1989) at 143. The sole bases for including loans in the December 30 transaction were the size of the loan, whether the tax basis was close to its book value, whether New Sunbelt had a reliable tax history on the loan, and whether the loan was fully funded. Vail Dep. at 241–42. FSLIC–Corporate had no involvement in formulating these criteria nor did its officials even see the list of loans selected until after the transaction was completed. Bobby Lynn Hughes ("Hughes") Dep. at 151–52.

With respect to the Sweet Jan Note and the Park Forest Wrap Note, New Sunbelt did not search for loans involving common borrowers to put on the list. Hart Dep. (Oct. 25, 1989) at 63–64. The Sweet Jan and Park Forest loans were included in the transaction because they were commercial loans, not because of any relationship between the principals of the borrowers. *Id.* at 63. Those at New Sunbelt were unaware of any relationship between the Sweet Jan Note and the Park Forest Wrap Note. *Id.* at 239.

Plaintiffs contend FDIC–Corporate is not entitled to summary judgment on the fraudulent conveyance claim because there is sufficient evidence to permit a rational factfinder to return a verdict in their favor.[6] Plaintiffs recognize there is no direct evidence of actual intent to defraud and instead point the court to circumstantial evidence on which the court may properly rely. *See Roland,* 838 F.2d at 1402–03 ("Since direct proof of fraud often is not available, courts may rely on circumstantial evidence to establish the fraudulent intent").

Texas law provides the court with some guidance in this regard. Tex.Bus. & Comm.Code Ann. § 24.005(b) (West 1987) provides:

In determining actual intent ..., consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

---

6. Plaintiffs also oppose summary judgment by reurging previously-filed motions to strike the affidavit evidence on which FDIC–Corporate relies. Because the court holds that plaintiffs have raised a genuine issue of material fact and denies the motion to the extent it is based on the evidence presented, the court denies plaintiffs' motions to strike.

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

In *Roland* the Fifth Circuit listed the following as "indicia of fraud:" (1) whether the debtor transferred valuable property without consideration; (2) whether there existed a close personal relationship between the parties to the conveyance; (3) whether the debtor retained possession or other indicia of ownership of the property; and (4) whether the debtor transferred all of his property, especially if to different members of his family, leaving him unable to pay his debts. 838 F.2d at 1403. "When several of these indicia of fraud are found, they can be a proper basis for an inference of fraud." *Id.*

Plaintiffs present evidence of these indicia of fraud from which they contend a rational jury could infer fraudulent intent. They first point to the close relationship existing between the parties to the transfer. Even after the transfer, New Sunbelt continued to administer and service the transferred loans. Jean Brennan ("Brennan") Dep. at 174. Indeed, it is New Sunbelt employees who have personal knowledge of the issues in dispute in this action and who have provided the evidence necessary to support FDIC–Corporate's counterclaim. *See, e.g.,* C. Todd Moore Aff. and Brennan Aff.

Plaintiffs rely heavily on the involvement of Hart with activity on the notes prior to, during, and after the transfer. While an employee of New Sunbelt's predecessor, Hart was involved in the decision to cease making payments to BancTexas pursuant to the Park Forest Wrap Note. *See* Hart Dep. (Oct. 21, 1988) at 222. As of the fall or winter of 1988, Hart received reports from loan officers concerning the Sweet Jan Note. Hart Dep. (Oct. 25, 1989) at 33. Also during that time period, Hart became an employee of New Sunbelt and was involved in the decision of New Sunbelt, then the holder of the Park Forest Wrap Note, not to make payments to BancTexas. Hart Dep. (Oct. 21, 1988) at 277. His involvement continued because, as noted earlier, he was one of those responsible for selecting the loans to be transferred. Hart Dep. (Oct. 25, 1989) at 52.

Plaintiffs also present evidence of three other indicia of fraud. First, they present evidence that New Sunbelt, the alleged debtor, retained possession of the property after the transfer. Brennan testified that New Sunbelt continued to service both notes and retained all the loan documentation necessary to administer the loans. Brennan Dep. at 176. Hughes answered affirmatively when asked if it was "relatively unique" that New Sunbelt transferred assets to FSLIC but continued to manage them. Hughes Dep. at 232. Second, plaintiffs point out that New Sunbelt was insolvent at the time of the transfer. *See id.* at 129 and 379 (New Sunbelt did not meet its capital requirements and had a negative net worth). Third, plaintiffs show that New Sunbelt had already been sued in state court by the borrowers on the Park Forest Wrap Note. At the time of the transfer, Hart had been deposed in connection with the state court action. *See* Resp. at 6 n. 4.

The court concludes that plaintiffs have adduced sufficient circumstantial evidence to warrant presentation of this claim to a jury. Summary judgment is rarely appropriate when the central issue is one of intent. *See Fine v. American Solar King Corp.,* 919 F.2d 290, 298 (5th Cir.1990); *see also Quinn v. Dupree,* 157 Tex. 441, 303 S.W.2d 769, 774 (1957) (whether a conveyance was made with intent to defraud creditors is ordinarily a question for the jury). For the reasons set forth above, the court denies the motion for summary judgment as to the fraudulent conveyance claim.

## III

The court next considers plaintiffs' claim for an offset. Count two of plaintiffs' second amended complaint seeks a declaration that any liability of the plaintiffs to FDIC–Corporate based on the Sweet Jan Note is extinguished, offset, or reduced by the amounts recoverable in the other counts of the complaint. FDIC–Corporate contends the *D'Oench, Duhme* rule entitles it to judgment as a matter of law on this claim. The court agrees.

 The *D'Oench, Duhme*[7] estoppel rule bars defenses or claims against the FDIC that are based on unrecorded or secret agreements that alter the terms of facially unqualified obligations. *FDIC v. Hamilton*, 939 F.2d 1225, 1228 (5th Cir. 1991). In *Hamilton* the borrowers on a promissory note alleged they were entitled to a setoff for damages caused by the lender's breach of certain obligations. *See id.* at 1227. Because the obligations were not reflected in the bank's records, however, the court held the claim for a setoff was barred by *D'Oench, Duhme. Id.* at 1229.

In an attempt to avoid the estoppel rule, plaintiffs contend the "bilateral obligation" exception applies to their claims for offset. According to that exception, the *D'Oench, Duhme* doctrine is inapplicable where "the document the FDIC seeks to enforce is one ... which facially manifests bilateral obligations and serves as the basis of the [borrower's] defense." *Royal Bank of Canada v. FDIC*, 733 F.Supp. 1091, 1098 n. 13 (N.D.Tex.1990) (quoting *Howell v. Continental Credit Corp.*, 655 F.2d 743, 746 (7th Cir.1981)). In this instance, however, the obligations or duties that plaintiffs allege were breached were contained in the Park Forest Wrap Note, not the Sweet Jan Note. The basis of plaintiffs' defenses was not facially manifested in the bank's files concerning the Sweet Jan Note. The "bilateral obligation" exception is inapplicable in this instance. FDIC–Corporate is entitled to judgment as a matter of law

on the claims contained in count two of plaintiffs' second amended complaint.

\*   \*   \*   \*   \*   \*

The court grants in part and denies in part the motion for summary judgment.

SO ORDERED.

---

7. *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 453–54, 62 S.Ct. 676, 677–78, 86 L.Ed. 956 (1942).