23 F.3d 395
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
SWEDBANK (SPARBANKERNAS BANK), Plaintiff, Appellant,
v.
FEDERAL DEPOSIT INSURANCE CORP., AS RECEIVER OF BANK OF NEW
ENGLAND, N.A. Defendant, Appellee.
 No. 93-1338
 United States Court of Appeals,
First Circuit.
 May 13, 1994
 
 1
 Appeal from the United States District Court for the District of Massachusetts [Hon. A. David Mazzone, U.S. District Judge ]
 
 
 2
 Sven A. Johanson with whom Schneider, Johanson & Silin was on brief for appellant.
 
 
 3
 Roberta H. Clark, Counsel, with whom Ann S. DuRoss, Assistant General Counsel, and Richard J. Osterman, Jr., Senior Counsel, Federal Deposit Insurance Corporation, were on brief for appellee.
 
 
 4
 D.Mass.
 
 
 5
 AFFIRMED.
 
 
 6
 Before Breyer, Chief Judge, Aldrich, Senior Circuit Judge, and McAuliffe,* District Judge.
 
 
 7
 McAULIFFE, District Judge.
 
 
 8
 *Of the District of New Hampshire, sitting by designation.
 
 
 9
 Swedbank (Sparbankernas Bank) ("Swedbank") appeals from an order of the United States District Court for the District of Massachusetts granting summary judgment in favor of the Federal Deposit Insurance Corp. ("FDIC"), as receiver of Bank of New England, N.A. For the reasons discussed below, we affirm.
 
 
 10
 * Background
 
 
 11
 The following facts are not in dispute. Bank of New England, N.A. ("BNE") provided construction financing to BLN Realty Trust, Francis L. Nee, Trustee (the "Borrower"), to develop the Breakwater condominium project in Laconia, New Hampshire. Finnbohus AB, a Swedish manufacturer, supplied prefabricated housing components to the Breakwater project through an intermediary, Svenskahus/USA (the "Distributor"). Swedbank, a Swedish bank, provided commercial financing to Finnbohus.
 
 
 12
 In August 1987, BNE loaned $4.25 million to BLN Realty Trust. Of the $4.25 million, $2.75 million was earmarked for land acquisition and the remaining $1.5 million took the form of a revolving construction loan. In December 1987, BNE's loan committee agreed to increase the construction loan by $500,000.00, bringing it to $2.0 million.
 
 
 13
 The documents evidencing these extensions of credit (the "Loan Documents") show that the Borrower had contracted with the Distributor to supply the project with prefabricated housing components manufactured by Finnbohus, and that the Distributor had in turn contracted with Finnbohus to supply the components to it. Finnbohus performed its obligations, shipping prefabricated houses to the project, normally under letters of credit issued by BNE. But one shipment was made in 1988 without benefit of a letter of credit. Swedbank, as Finnbohus's banker, allowed that shipment to be made on "open credit." The value of the shipment was $460,000.00, which amount was never paid.
 
 
 14
 By letter dated May 3, 1988, Mr. Nee[1] contacted Swedbank on behalf of the Borrower and Distributor. He explained that because of a cash flow problem created by the premature shipment of housing components, he could not "guaranty a specific schedule of ... payments or a definite time frame for the completion of all payments." According to Nee, when Finnbohus shipped houses unexpectedly and without benefit of a letter of credit, the Borrower applied available cash to perform site work necessary for assembly and construction of the delivered houses. That left Borrower with insufficient cash to pay Finnbohus for the components shipped on open credit. The Borrower's cash flow problems were also exacerbated by a slowdown in new home sales in the Laconia area. Mr. Nee wrote that he was "willing to designate thirty (30) percent of all future requisition dollars [drawn under the Loan Documents] for payment directly to Swedbank against this account until all arrears are cleared up."
 
 
 15
 Nee also stated in his letter that BNE, through Vice President David Rockwell, had agreed to that proposal. Nee's May 3 letter contained a signature block for Mr. Rockwell, ostensibly to verify his agreement, but it was blank. However, seven days later, on May 10, 1988, Rockwell wrote directly to a representative of Swedbank as follows:
 
 
 16
 This letter is to indicate that I have received the May 3, 1988, letter recently received by you from Frank L. Nee of Svenskahus/USA, and am in agreement with it. Thank you.
 
 
 17
 The ambiguity of Rockwell's comment was apparent to Swedbank. Swedbank wrote to Rockwell on May 13, stating that it had "duly noticed [BNE's] agreement with Svenskahus/USA Inc. that 30 percent of future requisition dollars available at each closing up to an aggregate amount of USD 460,000.00 will be paid to us, Swedbank Stockholm."[2] BNE did not reply.
 
 
 18
 Although it made subsequent disbursements to the Borrower under the construction loan, BNE did not send thirty percent directly to Swedbank, nor did the Borrower use any proceeds from those closings to pay down the outstanding account with Finnbohus. On January 6, 1991, BNE was declared insolvent by the Comptroller of the Currency and the FDIC was appointed receiver. Swedbank filed a claim with the FDIC in the amount of $460,000.00, plus interest, based on BNE's failure to allocate thirty percent of subsequent loan disbursements to it. The FDIC rejected Swedbank's claim and Swedbank filed suit in the United States District Court for the District of Massachusetts. The district court entered summary judgment in favor of the FDIC, holding that Swedbank's claim was barred by D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942), and 12 U.S.C. Sec. 1823(e). Swedbank filed a timely appeal to this court.
 
 II
 Discussion
 
 19
 Our review of district court decisions granting summary judgment is plenary. August v. Offices Unlimited, Inc., 981 F.2d 576, 580 (1st Cir. 1992). Accordingly, in this case we independently determine whether a genuine dispute exists as to any material fact, and, if not, whether the FDIC is entitled to judgment as a matter of law. We will review the entire record in the light most favorable to Swedbank and indulge all inferences in its favor. FDIC v. Longley I Realty Trust, 988 F.2d 270, 272 (1st Cir. 1993).
 
 
 20
 In D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942), the Supreme Court established a federal common law doctrine of equitable estoppel that prevents a borrower from a federally insured institution from relying on any "scheme or arrangement" that tends or is likely to deceive creditors or banking authorities. D'Oench, 315 U.S. at 460. The decision was intended to prevent a borrower from invoking a "secret agreement" with a failed bank as a defense to the FDIC's demand for payment of obligations memorialized in the bank's records. See In re 604 Columbus Avenue Realty Trust, 968 F.2d 1332, 1344 (1st Cir. 1992). The D'Oench doctrine does not require a showing that a party had the intent to defraud. FDIC v. P.L.M. Int'l, Inc., 834 F.2d 248, 252-53 (1st Cir. 1987). Rather, the relevant inquiry is "whether the agreement, at the time it was entered into, would tend to mislead" the FDIC. Timberland Design, Inc. v. First Service Bank for Savings, 932 F.2d 46, 50 (1st Cir. 1991).[3] Eight years after the Supreme Court decided D'Oench, Congress enacted its statutory counterpart, 12 U.S.C. Sec. 1823(e). That section bars claims or defenses asserted against the FDIC based on any "agreement" that "tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it" from a failing or failed institution, unless the agreement meets certain requirements.[4]
 
 
 21
 In its Complaint, Swedbank alleges that BNE "agreed by letter dated May 10, 1988 to be bound by the agreement between Svenskahus/USA and Swedbank which was stated in the May 3, 1988 letter," Complaint, p 15, resulting in "a contract between Swedbank and the Bank of New England, N.A.," id., p 5. Swedbank appears to have abandoned this position on appeal, arguing instead that the May 3 and May 10 letters do not themselves constitute a contract or "agreement," but merely represent a "directive" by the Borrower to BNE to disburse a percentage of the funds payable under the 1987 construction loan directly to Swedbank. According to Swedbank, the Borrower's certification that housing units had been delivered and erected on the project site triggered BNE's obligation under the duly approved and recorded Loan Documents to disburse proceeds sufficient to pay for the units. The May 3 letter, it argues, was simply a "disbursement directive" authorizing BNE to make partial disbursements to Swedbank of loan proceeds already due. Swedbank says that this directive, which it seeks to enforce, is not subject to the D'Oench doctrine or section 1823(e) because it is only an "agreed upon instruction" as to "the logistics and methods" by which BNE should fulfill its "pre-existing obligation" under the Loan Documents; it is neither a separate agreement nor a modification of the 1987 construction loan agreement. See Appellant's Brief at 4, 8, 17.
 
 
 22
 This argument is facially appealing, but flawed. Swedbank's characterization of the May 3, 1988 letter as a "disbursement directive" is at odds with the plain language of the loan agreement. The Loan Documents themselves impose no duty upon BNE to make payments to third parties, like Swedbank, at the request of the Borrower. The Loan Documents do provide for payment to the General Contractor and Subcontractors when the Borrower makes a specific request, accompanied by required documentation. They also provide for the issuance of a letter of credit each time a loan advance is made to cover costs of the prefabricated housing units.[5] In the case at hand, however, the housing units at issue were shipped on "open credit," an arrangement not contemplated by the Loan Documents. It was only after the houses were shipped on open credit that Mr. Nee contacted Swedbank to explain the Borrower's cash flow problems and to propose a solution (i.e., payment of thirty percent of all future loan disbursements directly to Swedbank on Finnbohus's account). Moreover, the Loan Documents provide that obligations established under the construction loan agreement inure exclusively to the bank and the Borrower, and may not be assigned to or enforced by third parties absent authorization by BNE. Appellant's Brief, Appendix, Construction Loan Agreement, p 13, Loan Agreement General Conditions, paragraphs 21, 25. Thus, Swedbank cannot support its claim relying solely on the Loan Documents.
 
 
 23
 The May 1988 letters provide the only plausible source of such an obligation. Only by reference to these letters can Swedbank maintain that BNE was duty bound to direct partial loan disbursements to it to cover the Borrower's (or, more accurately, the Distributor's) antecedent debt to Finnbohus. The proposed arrangement required BNE to pay a percentage of future disbursements under the Loan Documents directly to Swedbank rather than to or through the Borrower as the Loan Documents provided. In other words, part of future loan advances made under the loan's specific terms for specific other purposes was to be directed to Swedbank to reduce the "open credit" arrearage. To the extent the letters purport to so modify BNE's contractual obligations to the Borrower, they constitute an "agreement" within the meaning of D'Oench and section 1823(e). The inquiry thus turns to whether that agreement is enforceable against the FDIC as receiver.
 
 
 24
 If allowed, Swedbank's claim would diminish the FDIC's interest in assets it acquired as receiver of BNE. Specifically, FDIC's interest in the Borrower's obligation under its note would be diminished by an amount equal to thirty percent of the loan advances made after the May 1988 agreement. That agreement is valid under section 1823(e), then, only if it satisfies four criteria: the agreement must have been (1) in writing; (2) executed by BNE and Swedbank "contemporaneously with the acquisition of the asset by [BNE]"; (3) approved by BNE's board of directors or loan committee (which approval must be reflected in the minutes of the board or committee); and (4) "continuously, from the time of execution, an official record of [BNE]." See 12 U.S.C. Sec. 1823(e).
 
 
 25
 The agreement was indeed in writing, but Swedbank does not suggest that it was executed contemporaneously with BNE's acquisition of the asset [Borrower's note] nor that it was ever reviewed or approved by BNE's board of directors or loan committee. Swedbank also does not contend that the May 3, 1988 letter outlining the proposal was contained in BNE's records.[6]
 
 
 26
 Accordingly, we necessarily find that no material facts are in dispute, and the district court was plainly correct in holding that the May 1988 letters failed to satisfy the prerequisites of enforceability described in section 1823(e), insofar as the agreement (i) was not approved by BNE's board of directors or loan committee, (ii) was not executed contemporaneously with BNE's acquisition of the asset (i.e., the promissory note and security instruments), and (iii) was not maintained as an official record of BNE.
 
 
 27
 Finally, Swedbank argues that the May 3 letter constituted a disbursement directive, which, despite its technical failure to comply with the Loan Documents' requirements for valid disbursement directives, nevertheless fully complied with standard and accepted banking industry practice. That argument also must fail. Standard industry practice, whatever it might be, cannot operate to insulate a claim against the FDIC from the requirements of D'Oench or section 1823(e). We agree with the Court of Appeals for the Fifth Circuit that the "rationale which bars claims based upon oral agreements and collateral writings is equally applicable to claims based on unwritten, albeit widespread and prevailing, banking customs." FDIC v. Hamilton, 939 F.2d 1225, 1229 (5th Cir. 1991). Were borrowers permitted to assert claims or defenses based upon unwritten industry practices and customs, particularly when those practices and customs are inconsistent with the Loan Documents contained in a bank's records and upon which the examiners relied, the policies underlying D'Oench and section 1823(e) would be severely eroded. See, e.g., FDIC v. Caledonia Investment Corp., 862 F.2d 378, 383 (1st Cir. 1988) (rejecting argument that bank's custom and practice of accepting late payments constituted an "agreement" between the bank and the borrower which would bind the FDIC in the absence of a written agreement meeting the requirements of section 1823(e)).
 
 III
 Conclusion
 
 28
 Swedbank has pointed to no provision in the Loan Documents imposing any duty on BNE to make disbursements from the Borrower's account directly to Swedbank. Only by referring to the May 1988 letters can Swedbank support its claim that BNE had any such duty. Because those letters, if given effect, would alter BNE's contractual obligations to the Borrower, they constitute an agreement to amend the Loan Documents in a manner that would diminish FDIC's interest in the asset. To be enforceable against the FDIC as receiver, the agreement must meet the strict tests of D'Oench and section 1823(e). We hold it does not.
 
 
 29
 Accordingly, the judgment of the district court is
 
 
 30
 Affirmed.
 
 
 31
 * * *
 
 
 
 [1]
 In addition to serving as trustee of the Borrower, Francis Nee also served as vice president of the Distributor. Although his May 3, 1988, letter to Swedbank was printed on the Distributor's (Svenskahus/USA) letterhead, Mr. Nee appears to have been writing as both trustee of the Borrower and vice president of the Distributor
 
 
 [2]
 We note that Swedbank refers to the agreement as being one between the Bank and the Distributor, rather than between the Bank and the Borrower. It is unclear what, if any, authority the Distributor had to enter into such an agreement concerning disposition of loan proceeds to which the Borrower was entitled
 
 
 [3]
 This court has followed other circuits in holding that the D'Oench doctrine "operates to bar affirmative claims as well as defenses [asserted against the FDIC] which are premised upon secret agreements." Timberland, 932 F.2d at 49
 
 
 [4]
 12 U.S.C. Sec. 1823(e) provides:
 No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement-
 (1) is in writing;
 (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution;
 (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee; and
 (4) has been continuously, from the time of execution, an official record of the depository institution.
 
 
 [5]
 The loan agreement provides, in pertinent part, as follows:
 Certain advances for "hard costs" to be made under the Revolving Construction Notes are to be made by means of one or more Letters of Credit in the form of Exhibit "LC" attached hereto, to the benefit of [Svenskahus/USA], as security for deferred payments due [Svenskahus/USA] on account of orders for "panelized" units to be delivered to the Project pursuant to the Distribution Contract.
 The issuance of any such letter of credit shall be treated hereunder as an advance for all purposes hereunder (including, without limitation, the accrual of interest thereon and determination of the credit availability under the Revolving Construction Note) equal in amount to the amount of such Letter of Credit....
 Appellant's Brief, Appendix, Construction Loan Agreement, p 12. Additionally, paragraph 7 of the Loan Agreement General Conditions provides the specific conditions under which every advance against the revolving loan was to be made and the documentation required to support each such request. Id., Loan Agreement General Conditions, p 7.
 
 
 [6]
 The May 10, 1988 letter from Mr. Rockwell, the Bank's vice president, to Swedbank, in which Rockwell agreed with the May 3, 1988 letter, was found in the Bank's records, as was a copy of Swedbank's letter of May 13, 1988. However, the May 3, 1988 letter, which outlined the terms of the "agreement" or "disbursement directive," was not found in the Bank's records